D. & B. IMPORT CORP. *v.* UNITED STATES (No. 4334)[1]

¹C. D. A. 172.

66

United States Court of Customs and Patent Appeals, May 5, 1941

*Barnes, Richardson & Colburn* (*J. Bradley Colburn* of counsel) for appellant.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Charles J. Miville,* special attorney, of counsel), for the United States.

[Oral argument April 15, 1941, by Mr. Colburn and Mr. Lawrence]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (Third Division) overruling a protest of appellant against the assessment by the collector at the port of New York of duty at 5 dollars per gallon under paragraph 802 of the Tariff Act of 1930 upon certain bottles of Bacardi rum. The rum was imported from Bermuda in two shipments, one on May 15, 1934, and the other on June 14, 1934, and entered in bonded warehouse at the port of New York.

Appellant made various claims in its protest, but by stipulation limited its claims to those hereinafter set forth.

Before the Customs Court the cause was submitted upon a stipulation, Exhibit 1 which, omitting the schedule attached thereto, reads as follows:

It Is Stipulated by and between the Assistant Attorney General for the United States and counsel for the importer in the above entitled case:

That the merchandise here involved consists of bacardi rum in bottles each containing one gallon or less manufactured or produced in the Republic of Cuba by Compania Ron Bacardia, S. A. Santiago de Cuba.

That in or about June, 1932, said rum was sold and shipped by the Compania Ron Bacardi to Chartier & Co. at St. Georges, Bermuda. That upon arrival at St. Georges, Bermuda, said rum was placed in customs bonded warehouse by Chartier & Co. and remained in continuous customs custody at that port without being changed in form or condition.

That in or about February, 1934, said rum was sold by Chartier & Co. to the D. & B. Import Corporation, the plaintiff herein, and was shipped out of customs custody in Bermuda by said Chartier & Co. to said D. & B. Import Corporation at New York. That upon arrival at New York, said merchandise was entered for warehouse by plaintiff under Warehouse Bond Entries 57218 of May 15, 1934, and 59826 of June 14, 1934.

That subsequent to its importation at New York a part of said rum was exported and a part withdrawn for consumption in the United States.

That the quantity of said rum withdrawn for consumption in the United States and the dates of each withdrawal are as set forth in Schedule "A" attached hereto and made a part hereof.

That all of said rum withdrawn for consumption in the United States as set forth in said Schedule "A" was assessed for duty by the Collector of Customs at $5.00 per gallon under Paragraph 802 of the Tariff Act of 1930.

That the protest is limited to the quantities withdrawn for consumption as shown by the said Schedule "A" and is further limited to the claims:

(1) That the merchandise withdrawn from bonded warehouse for consumption in the United States prior to September 3, 1934, is properly dutiable at $5.00 per gallon, less 20 per cent under and by virtue of the Convention of Commercial Reciprocity of 1902 between the United States and Cuba and Section 316 of the Tariff Act of 1930.

(2) That the merchandise withdrawn for consumption on and after September 3, 1934, is dutiable at only $2.50 per proof gallon under the provisions of the Trade Agreement between the United States and the Republic of Cuba, T. D. 47232.

(3) That the protest is abandoned as to all other merchandise and in all other respects.

It thus appears that the only question before the trial court was whether the sale of the rum to a firm in Bermuda, its exportation thereto, and its subsequent importation from Bermuda to the United States, deprived it of its status as merchandise entitled to the benefit of preferential treatment under the Cuban Reciprocity Treaty of 1902, as to a part of the rum, and under the Cuban Reciprocal Trade Agreement of 1934 as to the remainder of the rum here involved.

Paragraph 802 of the Tariff Act of 1930 reads as follows:

PAR. 802. Brandy and other spirits, manufactured or distilled from grain or other materials, cordials, liqueurs, arrack, absinthe, kirschwasser, ratafia, and bitters of all kinds containing spirits, and compounds and preparations of which distilled spirits are the component material of chief value and not specially provided for, $5 per proof gallon.

Section 316 of said tariff act reads as follows:

SEC. 316. CUBAN RECIPROCITY TREATY NOT AFFECTED.

Nothing in this Act shall be construed to abrogate or in any manner impair or affect the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or the provisions of the Act of December 17, 1903, chapter 1.

The pertinent parts of the Treaty of Commercial Reciprocity between the United States and Cuba, signed December 11, 1902,

33 Stat., part 2, p. 2136, (hereinafter referred to as the "Cuban Reciprocity Treaty,"), read as follows:

\*     \*     \*     \*     \*     \*     \*

The President of the United States of America and the President of the Republic of Cuba, animated by the desire to strengthen the bonds of friendship between the two countries, and to facilitate their commercial intercourse by improving the conditions of trade between them, have resolved to enter into a convention for that purpose,   \*   \*   \*

\*     \*     \*     \*     \*     \*     \*

### ARTICLE II.

During the term of this convention, all articles of merchandise not included in the foregoing Article I and being the product of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of twenty percentum of the rates of duty thereon as provided by the Tariff Act of the United States approved July 24, 1897, or as may be provided by any tariff law of the United States subsequently enacted.

\*     \*     \*     \*     \*     \*     \*

### ARTICLE VIII.

The rates of duty herein granted by the United States to the Republic of Cuba are and shall continue during the term of this convention preferential in respect to all like imports from other countries,   \*   \*   \*

The act of Congress ratifying the Cuban Reciprocity Treaty, 33 Stat., part 1, p. 3, reads in part as follows:

\*   \*   \*   all other articles of merchandise being the product of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of twenty per centum of the rates of duty thereon, as provided by the Tariff Act of the United States,   \*   \*   \*. The rates of duty herein granted by the United States to the Republic of Cuba are and shall continue during the term of said convention preferential in respect to all like imports from other countries:   \*   \*   \*.

SEC. 2.   \*   \*   \*   that articles of the Republic of Cuba shall receive, on their importation into the ports of the United States, treatment equal to that which similar articles of the United States shall receive on their importation into the ports of the Republic of Cuba;   \*   \*   \*.

The trade agreement between the United States and the Republic of Cuba, referred to in the stipulation (and hereinafter referred to as the "Cuban Trade Agreement"), was authorized by the act of Congress approved June 12, 1934, (48 Stat., part 1, p. 943), entitled "An Act To amend the Tariff Act of 1930" (hereinafter referred to as the "Reciprocal Trade Agreement Act"). Said act reads in part as follows:

SEC. 350 (b). Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or to preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba:   \*   \*   \*.

The pertinent parts of the trade agreement entered into between the United States and the Republic of Cuba, T. D. 47232, 66 Treas. Dec. 190, are as follows:

\* \* \* \* \* \* \*

The President of the United States of America and the President of the Republic of Cuba, desirous of strengthening the traditional bonds of friendship and commerce between their respective countries by maintaining as the basis for their commercial relations the granting of reciprocal preferential treatment, in continuation of the policy adopted in the Convention of Commercial Reciprocity of 1902 between the two countries, and taking into consideration that changed conditions have rendered it necessary to modify the provisions of that Convention, have arrived at the following Agreement:

\* \* \* \* \* \* \*

### ARTICLE III.

Articles the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto and made a part of this Agreement, shall, on their importation into the United States of America, be granted exclusive and preferential reductions in duties not less than the percentages specified respectively in Column 1 of the said Schedule, such percentages of reduction being applied to the lowest rates of duty, respectively, now or hereafter payable on like articles the growth, produce, or manufacture of any other foreign country.

No article the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall in any case, except as provided in Article VIII or X, be subject to any customs duty in excess of the rate so specified.

\* \* \* \* \* \* \*

### ARTICLE V.

\* \* \* \* \* \* \*

With respect to the allotment of quotas by the United States of America or the Republic of Cuba for any article on which quantitative restrictions are not prohibited by this Agreement, there shall be no discrimination against any person or company importing or exporting such articles between the two countries.

\* \* \* \* \* \* \*

### ARTICLE VIII.

All articles the growth, produce, or manufacture of the United States of America or the Republic of Cuba, shall, after importation into the territory of the other country, be exempt from national or federal internal taxes, fees, charges, or exactions, other or higher than those payable on like articles of national or any other foreign origin.

\* \* \* \* \* \* \*

### ARTICLE XIII.

No administrative ruling by the United States of America or the Republic of Cuba effecting advances in duties or charges applicable under an established and uniform practice to imports from the territory of the other country shall be effective retroactively or with respect to articles either entered for or withdrawn for consumption prior to the expiration of thirty days after the date of publication of notice of such ruling in the usual official manner. \* \* \*

\* \* \* \* \* \* \*

SCHEDULE II

| Tariff Act of 1930 paragraph | Description of articles | Column 1 Minimum preferential reduction to Cuba | Column 2 Maximum rates of duty. Specific rates in United States dollars |
|---|---|---|---|
| * | *    *    *    * | * | * |
| 802 | Rum, in bottles containing each one gallon or less_____ | 20% | 2.50 per proof gallon. |
| * | *    *    *    * | * | * |

The trial court concluded an exhaustive opinion as follows:

Since the commercial transaction under which the merchandise herein involved became an importation into the United States was between a firm in Bermuda and a firm in the United States, we hold that, even though the rum was produced in Cuba, the importation is not subject to the provisions of the Cuban Convention of Commercial Reciprocity of 1902 or the trade agreement of August 24, 1934. The protest is overruled. * * *

The basis of the conclusion of the trial court was that, while the rum in question was produced in Cuba, the proper interpretation of the Cuban Reciprocity Treaty and of the Cuban Trade Agreement is that only articles the growth, produce or manufacture of Cuba, imported into the United States from Cuba, are entitled to the preferential rates designated therein.

In the case of *Marks Co. et al.* v. *United States,* 12 Ct. Cust. Appls. 110, T. D. 40031, the question of the interpretation of the Cuban Reciprocity Treaty was involved, and the same question here involved was there raised, but the court found it unnecessary to decide it. However, with respect to the general question of the proper interpretation of the treaty, the court said:

The treaty under consideration is a reciprocity treaty between the United States Government and the Government of the Republic of Cuba. No other country is mentioned therein and no other included within its terms. The treaty must be construed liberally and according to the intention of the parties thereto; and the language used therein is to be interpreted by the same process of reasoning and by the same rules of construction as are applied to the interpretation of contracts between individuals.—Tucker v. Alexandroff (183 U. S. 224).

See also *Louis Wolf & Co.* v. *United States,* 27 C. C. P. A. (Customs) 188, C. A. D. 84.

Appellant concedes that the Cuban Reciprocity Treaty and the Cuban Trade Agreement each should be construed as a whole, but contends that, when so construed, the preferential rates provided therein are applicable to the involved merchandise.

We are frank to say that if a paragraph of the tariff act provided that articles the growth, produce, or manufacture of the Republic of Cuba imported into the United States should be admitted at a reduction of 20 per centum of the general rate of duty provided in the tariff act, a very different question would be presented. That question is

not presented here for, under the issue before us, we must construe the Cuban Reciprocity Treaty and the Cuban Trade Agreement each as a whole to determine the intent of the parties thereto with respect to importations from countries other than Cuba of articles the growth, produce, or manufacture of Cuba.

The stipulation states that in or about June, 1932, the rum here involved was sold by the Cuban producer to Chartier & Co. at St. Georges, Bermuda; that it was exported to Bermuda and there placed in bonded warehouse by the purchaser, where it remained for more than 1½ years; that it was then sold by Chartier & Co. to appellant, and was imported into the United States from Bermuda.

There is much discussion in the briefs of the parties respecting the question of whether the rum in bonded warehouse in Bermuda had entered the commerce of Bermuda. For the purposes of this case we find it necessary to observe only that when the rum was shipped from Bermuda to the United States it constituted commerce, not between Cuba and the United States, but between Bermuda and the United States. Cuba had lost all jurisdiction over the rum, and while in bonded warehouse in Bermuda the rum was wholly subject to the jurisdiction of Bermuda, a colony of Great Britain.

It appears that on April 18, 1904, C. H. Keep, Assistant Secretary of the Treasury, in a letter addressed to the Collector of Customs, New York, (T. D. 25209, 7 Treas. Dec. 616), instructed him that under the Cuban Reciprocity Treaty certain tobacco the product of Cuba, exported to Germany and there held in customs custody without payment of duties, and thereafter exported from Germany to the United States, was entitled to the preferential rate of duty named in the Cuban Reciprocity Treaty, upon the furnishing of evidence of the above facts.

Article 634, Customs Regulations 1915, and article 770 of Customs Regulations 1923 conformed to said letter of instruction of April 18, 1904.

On November 7, 1929, the Secretary of the Treasury addressed a letter (T. D. 43658, 56 Treas. Dec. 408) to the Collector of Customs, New York, which reads as follows:

SIR: The department recently had before it for consideration and decision the question whether sugar of Cuban origin would be entitled to the 20 per cent deduction provided in the Cuban Commercial Agreement if shipped from Cuba to a foreign country and there sold by the consignee and later shipped to the United States.

The case presented to the department for a ruling was an actual sale in Cuba of Cuban raw sugar to an English firm for shipment to Liverpool, which upon arrival in Liverpool was unloaded and placed in a bonded warehouse, and so far as the Cuban seller knew or was concerned the final destination of the sugar was Liverpool, the sugar being later sold by the English purchaser to an American firm for shipment to the United States.

The commercial agreement above referred to provides that dutiable articles, the product of the soil or industry of Cuba, shall upon importation into the United States be entitled to a deduction of 20 per cent of the rate provided in the existing tariff act. In construing this provision of the agreement the Board of United States General Appraisers, in T. D. 34125, stated that while the language of the agreement does not expressly provide that to be entitled to the 20 per cent reduction the merchandise must be a direct shipment from Cuba to the United States, the entire purpose of the agreement would be defeated if Cuban products had been exported to other countries and had become a part of the commerce of other countries and subsequently imported into the United States with the benefit of the deduction of 20 per cent. The board in this decision expressed the opinion that the agreement was intended to extend a tariff privilege to the Republic of Cuba, the privilege being extended upon considerations expressly stated in the agreement, and that accordingly where a citizen of Cuba had ceased to be interested in its products by having exported them to another country the purpose of the agreement would not be served by allowing the 20 per cent reduction if they were imported into this country from other foreign countries.

The position of the board as announced in the decision cited, that the agreement was for the purpose of giving preferential treatment on merchandise passing between the two countries, would seem to be supported by the President's proclamation published in T. D. 24836 from which the department quotes as follows:

Whereas a convention between the United States of America and the Republic of Cuba to facilitate their commercial intercourse by improving the conditions of trade between the two countries was concluded and signed by their respective plenipotentiaries at the city of Habana on the 11th day of December, 1902.

For the reasons stated in the foregoing the department is of the opinion that when Cuban products are sold to foreign countries and the seller has lost title and interest in the products, such products upon being subsequently shipped to the United States would not be entitled to the 20 per cent deduction whether such products had been placed in a bonded warehouse in a foreign country or not. Accordingly, the department is of the opinion that in the case referred to in the second paragraph of this letter the sugar would not be entitled to the 20 per cent deduction.

A different situation would be presented if Cuban sugar was shown either by the invoice or bill of lading to be destined to the United States by way of a foreign country even though the sugar was trans-shipped in a foreign port. Such a shipment would, in the opinion of the department, entitle the sugar to the 20 per cent deduction. You will be governed accordingly.

Article 770 of the Customs Regulations, in so far as it is in conflict with the foregoing, will be amended.

The customs regulation referred to in the letter was thereafter amended and in Customs Regulations 1931 appears as follows:

Art. 848. Preferential duty—Cuban products * * *.—(a) The reciprocity treaty between the United States and Cuba, proclaimed December 17, 1903, provides that the products of the soil or industry of Cuba shall be admitted into the United States at a reduction of 20 per cent of the regular tariff rates of duty thereon. This reduction applies to all direct shipments and to such indirect shipments as are accompanied by proof that the merchandise was destined to the United States at the time of shipment from Cuba, and also a certificate of the proper customs' officer of each foreign country through which the merchandise passed en route to the United States, showing continuous customs custody of the shipment while in such foreign country.

T. D. 34125, 26 Treas. Dec. 130, referred to in the letter of the Secretary of the Treasury above quoted, was entitled "In the matter of \* \* \* O. G. Hempstead & Son," decided by the Board of General Appraisers (now the United States Customs Court) on January 27, 1914, and is well digested in said letter of the Secretary. It is true, as pointed out by appellant here, that the precise ground of overruling the protest in that case was that the record did not show that the cigars there involved had not mingled with the commerce of England before being exported to this country. However, the changed view of the Treasury Department with respect to the subject prevents any consideration of long-continued administrative practice in the interpretation of the Cuban Reciprocity Treaty so far as the issue here under consideration is concerned. See *United States* v. *Mills & Gibb*, 8 Ct. Cust. Appls. 422, T. D. 37667.

We now come to a consideration of the interpretation of the terms of the Cuban Reciprocity Treaty and of the Cuban Trade Agreement.

The opening paragraph of the treaty states that the treaty's purpose is to facilitate the commercial intercourse and improve the conditions of trade *between the United States and Cuba*. The respective plenipotentiaries are then recited, and it is then stated that they have "agreed and do hereby agree upon the following articles for the *regulation and government of their reciprocal trade*, namely:— \* \* \*." [Italics ours.] Then follow the various articles of the treaty.

It seems clear from the foregoing that the entire treaty is a regulation of commerce between the United States and Cuba, and that it was the intent of the treaty that only such commerce should be affected by its terms. This view is strongly supported by the provision of article VIII reading as follows:

The rates of duty herein granted by the United States *to the Republic of Cuba* are and shall continue during the term of this convention preferential in respect to all *like imports* from other countries, \* \* \*. [Italics ours.]

It will be observed that the rates of duty named in the treaty are granted by the United States *to the Republic of Cuba*. So long as articles the growth or product of Cuba are within its jurisdiction, Cuba is interested in the rates of duty to be levied thereon when imported into the United States from Cuba; but when its products have been sold and exported to another country, Cuba is not interested in having accorded to such products, upon their importation into the United States from such other country, the preferential tariff treatment provided for in the treaty. To grant to such products preferential treatment could affect the trade and commerce of Cuba with the United States only adversely, in that goods of Cuban origin, sold and exported to another country and imported from such country into the United States, might come in competition with like goods

sold by Cuban concerns and imported into the United States from Cuba.

The above-quoted language from article VIII further supports this view in the provision that the rates of duty named in the treaty should be "preferential in respect to all like imports from other countries." The rum here involved is clearly like rum imported into the United States from Cuba under a preferential rate, and to assess the same duties upon Cuban rum imported from other countries would, it seems to us, clearly destroy a preference granted to Cuba in said article VIII.

Viewing the treaty as a whole, as we are required to do, we are of the opinion that the provision of article II providing for a reduction of 20 per centum from the regular tariff rates upon articles the product of the soil or industry of Cuba, imported into the United States, was clearly intended to be limited to such articles as might become the subject of commerce between the United States and Cuba; or, in other words, the preferential treatment is limited to articles imported into the United States from Cuba. To hold otherwise would, in the instant case, give to Bermuda with respect to some of its commerce a preference which was, by the very terms of the treaty itself, granted only to the Republic of Cuba.

We now come to consider the interpretation of the Cuban Trade Agreement. Many of the observations already made with respect to the Cuban Reciprocity Treaty are also applicable to the trade agreement.

The Reciprocal Trade Agreement Act authorized the President of the United States to conclude an exclusive agreement with Cuba modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba.

While the Cuban Trade Agreement, made pursuant to the Reciprocal Trade Agreement Act, is not so explicit in its terms that its benefits should be confined to Cuba and the United States as is the Cuban Reciprocity Treaty, it is clear to us that there was no intention to change the policy of said treaty by extending the benefits of said trade agreement to commerce between the United States and countries other than Cuba.

The preamble of the Cuban Trade Agreement states as follows:

The President of the United States of America and the President of the Republic of Cuba, desirous of strengthening the traditional bonds of friendship and commerce *between their respective countries* by maintaining as the basis for their commercial relations the granting of reciprocal preferential treatment, in continuation of the policy adopted in the Convention of Commercial Reciprocity of 1902 *between the two countries,* * * *. [Italics ours.]

It is plain from the foregoing quotation that the negotiators of the Cuban Trade Agreement had the same purpose as did the negotiators of the Cuban Reciprocity Treaty, viz, maintaining as a basis for the

*commercial relations* between the United States and Cuba the granting of preferential treatment, and that no change in policy with respect to such preferential treatment was contemplated.

We have repeatedly held that the benefits granted to Cuba by the Cuban Trade Agreement are exclusive and preferential. *Geo. W. Cole & Co. et al.* v. *United States*, 27 C. C. P. A. (Customs) 201, C. A. D. 85; *Louis Wolf & Co.* v. *United States*, 27 C. C. P. A. (Customs) 188, C. A. D. 84; *E. J. Burke, Ltd.* v. *United States*, 26 C. C. P. A. (Customs) 374, C. A. D. 44; *F. H. Von Damm* v. *United States*, 25 C. C. P. A. (Customs) 97, T. D. 49094.

Should it be held that articles imported into the United States from any country other than Cuba, which articles are the growth or product of Cuba, are entitled to the benefits of the Cuban Trade Agreement, then the duties named therein with respect to such articles would not be preferential to Cuba, and the terms of the agreement would be violated.

Appellant contends that "The provisions of that treaty and trade agreement must be construed in a broad and liberal spirit" and that "when two constructions are possible, one restrictive of rights that may be claimed under them and the other favorable to them, the more liberal one should be adopted." We are in agreement with this statement, but there is also another rule—that the provisions should be liberally construed to carry out the intentions of the parties in making them.

It is well established that if the general purpose of an instrument is ascertained, the language of its provisions must be construed with reference to that purpose and so as to subserve it. *Legal Tender Cases,* 12 Wall. 457.

It is equally well established that words in a contract which admit of a more extensive or a more restricted significance must be taken in that sense which is required by the subject matter, and which will best effectuate what it is reasonable to suppose was the real intention of the parties. *Church* v. *Hubbart,* 2 Cranch 187.

In the case of *Factor* v. *Laubenheimer,* 290 U. S. 276, the court stated:

In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred. * * *

The parties to the Cuban Reciprocity Treaty and the Cuban Trade Agreement are Cuba and the United States. The instruments

relate to the commerce between these two countries, and they should be liberally construed to carry out the intention of the parties thereto, which was to facilitate commerce and trade between the two countries.

In order for appellant to succeed, it must rely upon a construction of the provision, standing alone, that "articles the growth, produce, or manufacture of the Republic of Cuba  *  *  *  shall, on their importation into the United States of America, be granted exclusive and preferential reductions in duties  *  *  *" etc., as set forth in article III of the Cuban Trade Agreement, and a like construction of a substantially similar provision set forth in article II of the Cuban Reciprocity Treaty.

Only by ignoring other provisions of these instruments could appellant's contention be sustained.  On the other hand, a liberal construction of the provisions above quoted, considering each of the documents as a whole, in order to carry out the intention of the parties thereto, must result in the conclusion that it never was intended that commerce between Bermuda and the United States, or commerce between the United States and any country other than Cuba, should be affected by their terms.

To sustain appellant's contention would clearly be a detriment to commerce between Cuba and the United States, for, to the extent that Cuban products are imported into the United States from countries other than Cuba, the sale of Cuban products by Cuban producers to purchasers in the United States would presumably be lessened by such importations, and thus, under appellant's construction, the rights of Cuba in its commerce with the United States would be restricted.

Applying this view to the rum here involved, it should be noted that the rum was sold by the Cuban producer to the purchaser in Bermuda more than 2 years previous to the effective date of the Cuban Trade Agreement, and yet appellant claims the benefits of such agreement with respect to a portion of the rum imported by it from Bermuda.  Thus Cuban rum the subject of commerce between Bermuda and the United States would directly compete with Cuban rum offered by its producers for export to the United States.

It is conceivable that there are products of Cuban manufacture still existent in Spain, of which Cuba was once a colony, and under appellant's theory any such product, even though exported from Cuba 50 years ago, would now be entitled, upon its importation into the United States from Spain, to reduced duties under the Cuban Trade Agreement.

It seems plain to us that such was never the intention of the negotiators of either the treaty or the agreement.

By holding that the benefits of said treaty and agreement apply only to articles imported into the United States from Cuba, com-

merce between the United States and Cuba is facilitated in accordance with the intentions of the negotiators as clearly expressed in the treaty and agreement.

We have not herein referred to many cases cited and discussed in the briefs of the respective parties for the reason that the facts with respect to many of them prevent the application of the decisions relied upon to the case at bar. It is true that the Supreme Court and this court have referred to the Cuban Reciprocity Treaty, and this court has referred to the Cuban Trade Agreement, as relating to imports from Cuba into the United States; but, as appellant's counsel have correctly observed, in none of such cases was the question here involved raised or in any way in issue.

In arriving at our conclusion that only articles imported into the United States from Cuba are entitled to the benefits of the Cuban Reciprocity Treaty and the Cuban Trade Agreement, we give to the treaty and trade agreement that construction which, in our opinion, will effectuate the real intention of the parties thereto, viz, to facilitate commerce and trade between the United States and Cuba by granting to Cuba exclusive preferential tariff treatment of articles the growth or product of that country imported into the United States from Cuba; of course, Cuba grants to the United States reciprocal tariff treatment of its products imported into Cuba from the United States, but that is of no concern here.

For the reasons herein stated, the judgment of the United States Customs Court is *affirmed*.